IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:10-CV-281-FL

VIOLA BRYANT,                          )
                                       )
         Plaintiff/Claimant,           )
                                       )
                                       )     **MEMORANDUM AND**
              v.                       )     **RECOMMENDATION**
                                       )
MICHAEL J. ASTRUE, Commissioner of     )
Social Security,                       )
                                       )
         Defendant.                    )

This matter is before the court on the parties' cross motions for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c). Claimant Viola Bryant ("Claimant") filed this action pursuant to

42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her applications for a period

of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

payments. The time for filing responsive briefs has expired and the pending motions are ripe for

adjudication. Having carefully reviewed the administrative record and the motions and memoranda

submitted by the parties, this court recommends denying Claimant's Motion for Judgment on the

Pleadings, granting Defendant's Motion for Judgment on the Pleadings and upholding the final

decision of the Commissioner.

## STATEMENT OF THE CASE

Claimant protectively filed an application for a period of disability, DIB and SSI on 8 March

2006, alleging disability beginning 16 August 2002. (R. 16). Both claims were denied initially and

upon reconsideration. (R. 57-60, 63-67, 69-74, 78-80). A hearing before the Administrative Law

Judge ("ALJ") was held on 9 October 2008, at which Claimant was represented by counsel and a

vocational expert ("VE") appeared and testified. (R. 26-55). On 3 November 2008, the ALJ issued a decision denying Claimant's request for benefits. (R. 13-25). On 14 May 2010, the Appeals Council denied Claimant's request for review. (R. 1-4). Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 474 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3); 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(2); 416.920a(e)(2).

In this case, Claimant alleges the following errors by the ALJ: (1) making a medical determination beyond the scope of his authority in evaluating Claimant's pancreatitis; (2) improper evaluation of state agency opinions and failure to order an additional consultative examination; and

3

(3) failure to properly assess Claimant's ability to perform past relevant work in accordance with Social Security Ruling ("S.S.R.") 82-62.[1] Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings at 11, 14, 16. ("Pl.'s Mem.").

## FACTUAL HISTORY

### I.    ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 18). Next, the ALJ determined Claimant had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the knee, pancreatitis, asthma, major depressive disorder and a history of alcohol abuse. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* In reviewing Claimant's alleged mental impairment and applying the technique prescribed by the regulations, the ALJ found that Claimant had mild restriction in activities of daily living, moderate difficulties in social functioning and in maintaining concentration, persistence or pace and had one episode of decompensation. (R. 19). Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform medium work,[2] maintain sufficient concentration, persistence and pace to perform simple, routine, repetitive tasks

---

[1] The court identifies and discusses the alleged assignments of error pursuant to the sequential evaluation process and not as presented by Claimant.

[2] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, she can also do sedentary and light work. 20 C.F.R. §§ 404.1567(c), 416.967(c).

4

not involving fast-paced or high-volume work, interact occasionally with coworkers and supervisors but no interaction with members of the public and adapt to routine changes in the job setting. (R. 20). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 23). At step four, the ALJ concluded Claimant had the RFC to perform the requirements of her past relevant work as a washer, housekeeper and industrial cleaner. (R. 24).

## II.    Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 54 years old and unemployed. (R. 31). Claimant lives with one of her three daughters and her two children. (R. 30-32). Claimant is a high-school graduate. (R. 32). Claimant's last job involved plastic assembly line work that ended after only two months of employment in November 2003 due to cutting her hand while on the job. (R. 33). Claimant testified some of her past jobs, including "packaging," were temporary positions only. (R. 33). Claimant testified further that she worked for two years as a custodian but left the position following a dispute with her employer. (R. 34).

Claimant testified to suffering from numerous impairments, including knee pain, back pain, pancreatitis, stomach ulcers, asthma, chronic bronchitis, sinusitis, high blood pressure, depression and auditory hallucinations. (R. 35, 42-43, 46, 49). Claimant testified that her medications cause no side effects with the exception of the occasional dry mouth. (R. 51). Claimant testified that her knee pain is her "worst problem" and that she began experiencing pain in both knees prior to her decision to stop work. (R. 35, 37). Claimant underwent left knee surgery in November 2006 but has not had surgery on her right knee. (R. 36). She testified that after surgery, her Medicaid coverage lapsed; thus, she was unable to afford physical therapy. (R. 36). Claimant testified that without Medicaid, she can only receive medical treatment via the emergency room. (R. 38). Claimant last

5

visited the hospital for knee pain in May 2008. (R. 39). Claimant testified that both knees hurt when she walks. (R. 37).

Claimant testified that she experiences low back pain due to a pinched nerve and had visted a chiropractor a "couple times" in either 2006 or 2007 for treatment. (R. 35, 39, 40). Claimant stated that as a result of the pinched nerve, her back felt "[l]ike somebody is pulling and twisting. It just ball[s] up . . . sometime[s]." (R. 39). Claimant testified that she has arthritis in her upper back and has received emergency treatment in the past. (R. 40). Claimant testified that lifting items increases her back pain. (R. 40).

Claimant testified that she had been hospitalized twice for pancreatitis. (R. 49). As a result of pancreatitis, Claimant's stomach "burns" when she eats greasy foods. (R. 40-41). Claimant explained that even when she abstains from greasy foods and takes her medication as directed, she still experiences some stomach burning. (R. 41). Claimant stated that whether her symptoms associated with pancreatitis would affect her ability to work "depends on how [she] eat[s]." (R. 41). Claimant testified that she "tr[ies] to avoid greasy foods." (R. 42).

Claimant had not received treatment for her ulcers in two years due to the lack of money. (R. 42). Claimant's asthma and bronchitis are treated with an inhaler and a nebulizer. (R. 43). Claimant testified that her blood pressure is "pretty well controlled" but when it is not controlled, she experiences headaches and dizziness. (R. 46).

Claimant undergoes mental health treatment for depression and auditory hallucinations. (R. 43). Claimant testified to crying often and to feeling sad, nervous and at times, cranky. (R. 44). Claimant stated she also experiences mood swings and hears voices on occasion. (R. 45). Claimant testified that her medications are fairly effective at eliminating her depression symptoms and

6

auditory hallucinations although Claimant testified that she had heard voices just two days prior to her hearing. (R. 45).

Claimant testified that she can walk at most one block and can lift a gallon of milk but "[n]ot much more." (R. 37, 40). Claimant sleeps until approximately ten in the morning and then she reads the newspaper or magazines. (R. 49-51). Claimant testified she babysits two of her grandchildren (fifteen and twenty months old) on occasion. (R. 50). In particular, Claimant babysits one grandchild on Mondays and Thursdays "for maybe three hours" and "sometimes" helps out with the other grandchild. (R. 50). Claimant testified that she does not visit or talk with friends or have any hobbies. (R. 44, 51). Claimant attends church every Sunday. (R. 44). Claimant does not have a driver's license. (R. 23). Claimant testified that she had one DUI three years ago and with the exception of drinking two beers in 2007, she has not had any alcohol since 2005. (R. 48-49).

## III.  Vocational Expert's Testimony at the Administrative Hearing

Julie Sawyer-Little testified as a VE at the administrative hearing. (R. 52-55). The VE testified that Claimant's past work consisted of washer (DOT #599.687-030), cleaner/housekeeping (DOT #323.687-014) and industrial cleaner (DOT #381.687-018). (R. 53). The ALJ asked the VE whether a hypothetical individual the same age and with the same educational and occupational background as Claimant could perform Claimant's past work if the individual can perform medium work, can stand, walk and sit about six hours total in an eight hour day with normal breaks, understand and remember simple instructions, maintain sufficient concentration, persistence and pace to perform simple, routine, repetitive tasks not involving fast-paced, high volume work, adapt to routine changes and interact occasionally with supervisors and coworkers but not with the public. (R. 54). The VE testified that such an individual could perform all three past positions held by

7

Claimant. *Id.*

The ALJ then asked the VE to assume a hypothetical individual with an RFC consistent with that described by Claimant in her testimony, which would be sedentary work with frequent unscheduled breaks and more than three absences per month. (R. 54). The VE testified that no jobs would be available. (R. 55). The ALJ asked the VE if there were conflicts between her testimony and information contained in the Dictionary of Occupational Titles, to which the VE responded in the negative. *Id.* Claimant's counsel did not ask any questions of the VE.

## DISCUSSION

I. **The ALJ did not make a medical determination beyond the scope of his authority in evaluating Claimant's pancreatitis.**

Claimant contends the ALJ "exercis[ed] an expertise he did not possess" when the ALJ, in evaluating Claimant's credibility, commented that Claimant's pancreatitis could be controlled with the proper diet. Pl.'s Mem. at 14-16 (quoting *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984)). The court disagrees.

In assessing Claimant's RFC and credibility, the ALJ acknowledged and discussed the medical evidence concerning Claimant's impairments, including pancreatitis. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (explaining the RFC is "based upon all relevant evidence in [an individual's] record"). The ALJ acknowledged Claimant's hospitalizations for stomach pain due to pancreatitis in February and March 2006 and in July 2007. (R. 21-22, 253, 259, 535). With respect to the February 2006 medical record, the ALJ observed that Claimant had reported a prior episode of pancreatitis, which Claimant attributed to possibly "alcohol or 'fatty foods.'" (R. 21, 259). The ALJ acknowledged that in March 2006, Claimant underwent endoscopic retrograde

8

cholangiopancreatography ("ERCP") with pancreatic stenting and that Claimant was discharged on a soft, low-fat diet. (R. 21, 253-54). The ALJ acknowledged further that on 18 July 2007, Claimant was hospitalized with acute pancreatitis and chronic pancreatitis. (R. 22, 535). The ALJ noted that Claimant underwent a sphincterotomy and replacement of the pancreatic stent due to changes suggestive of chronic pancreatitis. (R. 22, 536, 544). The ALJ observed further that after also undergoing a ERCP, Claimant experienced increased nausea, vomiting and pain, as well as increased amylase and lipase thought to be an exacerbation of her acute pancreatitis related to the ERCP. (R. 22, 536). The ALJ noted that at the time of discharge, while Claimant was still experiencing "some epigastric pain," her condition had significantly improved and she was tolerating a regular diet without difficulty. *Id.*

In addition to considering the relevant medical evidence, the ALJ also considered Claimant's testimony. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (explaining in assessing the RFC, the ALJ must also consider an individual's own "descriptions and observations of [her] limitations from [her] impairments"). Here, Claimant testified that even when she takes her medication and avoids greasy foods, she will still experience stomach pain associated with pancreatitis "sometimes but it's not bad . . . ." (R. 41). Claimant noted further that the impact of her symptoms associated with pancreatitis on her ability to work "depends on how [she] eat[s], like some greasy foods . . . I can't eat . . . I have to be very careful." *Id.* Claimant conceded, however, that while she "tr[ies] [to avoid greasy foods] pretty much . . . [s]ometimes it's hard . . . because I [] try to eat to keep my strength up." (R. 41-42). In discussing her pancreatitis and associated pain with her treating physician in February 2006, Claimant attributed the pain to both greasy foods and alcohol consumption – a statement properly acknowledged by the ALJ. (R. 21, 259). Claimant made a similar comment

9

during an August 2006 hospitalization where Claimant reported a long history of alcohol abuse until she developed pancreatitis earlier that same year and stopped drinking. (R. 19, 402). Accordingly, while Claimant correctly observes that "there is no information from her medical sources that any changes in diet or regimen would control her pancreatitis," Pl.'s Mem. at 15, the ALJ, in evaluating Claimant's RFC and credibility, properly acknowledged Claimant's own statements made during medical visits and her testimony during the administrative hearing that her pancreatitis can be controlled when she abstains from alcohol and greasy foods. (R. 23). In so doing, the ALJ did not substitute an untrained medical opinion for that of a medical professional or provide a medical opinion. *Cf. Wilson*, 743 F.2d at 221 (holding the ALJ, in finding that the clinical findings of the claimant's examining physician did not support his conclusions about the severity of plaintiff's limitations associated with her back impairment, "erroneously exercised an expertise he did not possess in the field of orthopedic medicine"). Rather, the ALJ's finding that Claimant's pancreatitis can be controlled with a proper diet simply reflects the weight and credibility the ALJ afforded Claimant's own subjective statements about her symptoms. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (In evaluating an individual's symptoms, an ALJ must consider "statements or reports from [the claimant].").

The ALJ analyzed all the relevant evidence, including Claimant's testimony, and sufficiently explained his findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "Although the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, . . .[the ALJ] is not required to function as the claimant's substitute counsel . . . ." *Bell v. Chater*, No. 95-1089, 1995 U.S. App. LEXIS 14322, at *12, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995) (unpublished table decision) (citing *Clark v.*

10

*Shalala*, 28 F.3d 828, 830-831 (8th Cir. 1994)) (internal citations and quotations omitted).

Ultimately, Claimant carries the burden of establishing a *prima facie* entitlement to benefits and

bears the risk of nonpersuasion. *Id.* (internal citations and quotations omitted). Here, Claimant has

conceded that her pancreatitis can be controlled with a proper diet and has not presented any

evidence to the contrary. Accordingly, Claimant's argument as to this issue is without merit.

II.     **The ALJ did not err in evaluating the opinions of state agency medical and psychological consultants and in declining to order a post-hearing consultative examination.**

Claimant contends the ALJ failed to "give a rational account for depriving [the opinions of

state agency consultants] weight" and that "[t]here is enough ambiguity about [Claimant's] mental

impairment to have put the ALJ on notice that further development [in the form of a third

consultative examination] was required." Pl.'s Mem. at 14, 19.

A.     *The ALJ's consideration of medical opinions by state agency consultants*

At step two of the sequential evaluation process, the ALJ found that Claimant's "alleged

possible borderline intellectual functioning is not a severe impairment . . . ." (R. 19). In so finding,

the ALJ discussed the examinations performed by state agency consultants Carol M. Gibbs, M.D.

and W. Jim Miller, Ph.D., on 29 June 2004 and 29 June 2005, respectively. (R. 19, 211-17). While

acknowledging Dr. Gibbs' diagnosis of borderline intellectual functioning (R. 217) and Dr. Miller's

opinion that Claimant was functioning "in the mild range of mental retardation," (R. 213), the ALJ

noted that these examinations were made in order to assess Claimant's mood order only. (R. 19)

The ALJ observed further that the examinations occurred "at a time of possible heavy alcohol use"

11

by Claimant[3] and that during Claimant's hospitalization in August 2006 for depression, Claimant was found to function in the average range of intelligence. (R. 19, 404-05, 412). Finally, the ALJ noted that Claimant graduated from high school with no evidence of special education and "since then has worked at least at half the time at a substantial gainful activity level." (R. 19, 32).

Claimant, describing the ALJ's above discussion of the consultative examinations as "dismissive treatment," argues the ALJ failed to "give a rational account for depriving [these examinations] of weight." Pl.'s Mem. at 14. In support of this contention, Claimant argues first that the ALJ erred in relying on "non-specific findings made in passing in a mental status examination" performed during Claimant's August 2006 hospitalization which Claimant emphasizes was for suicidal ideation and reassessment of her medication regimen for depression – not for a comprehensive evaluation of her cognitive status. *Id.* at 14, 19. Moreover, Claimant disputes the mental status examination finding that Claimant was of "average intelligence," noting she could not spell "world" backwards, was not oriented to place and only knew the month, day and year but not the date on which the examination occurred. Pl.'s Mem. at 19. Second, Claimant contends that her school records, which indicate that Claimant repeated first and eighth grades, "returned after twelfth

---

[3] The ALJ did not provide any further discussion regarding Claimant's history of alcohol use. The court observes that during the 2004 consultative examination, Dr. Gibbs noted that Claimant had a history of excessive alcohol use but had stopped drinking "a couple of years ago [i.e., in 2002] after she developed pancreatitis." (R. 216). However, numerous medical records reviewed by the ALJ note Claimant's continued use of alcohol. For example, records from Vance Family Medicine in 2006 indicate Claimant continued to "[d]rink[] a moderate amount of alcoholic beverages," and on 7 June 2006, Claimant was counseled to "dc [i.e., discontinue] etoh [i.e., alcohol]." (R. 360, 363, 368-69). These records contradict Claimant's statement during an August 2006 hospitalization where Claimant reported "a long history of alcohol abuse" but stated she had stopped drinking six months prior [i.e., February 2006] after undergoing surgery as a result of pancreatitis. (R. 19, 402). These records also contradict Claimant's testimony during the administrative hearing that with the exception of drinking two beers in 2007, she has not had any alcohol since 2005. (R. 48-49).

12

grade to finish school," and scored a 70 on the Otis Quick Mental Ability test, support the conclusions of Dr. Gibbs and Dr. Miller. Pl.'s Mem. at 14, 18; (R. 165-67)[4].

Claimant essentially contends that the ALJ improperly weighed the evidence before him. However, the court's duty is to determine if substantial evidence supports the ALJ's conclusions – not to sit *de novo* as the adjudicator. *See Mastro*, 270 F.3d at 176. The ALJ correctly observed that the consultative examinations were limited to an analysis of Claimant's mood disorder. Neither Dr. Gibbs nor Dr. Miller administered a Weschler Adult Intelligence Scale III test to assess Claimant's IQ or any achievement testing documenting Claimant's grade level in reading or math. *See e.g., Fisher v. Barnhart*, 181 Fed. Appx. 359, 361 (4th Cir. 2006) (noting a state agency consultant's borderline intellectual functioning determination was based on IQ and achievement testing). Also, the mental status examinations performed by both state agency examiners are similar to that performed during the August 2006 psychiatric assessment. Indeed, all three mental examinations included findings regarding Claimant's orientation, memory, concentration and knowledge. (R. 212, 216, 412). Yet, Claimant takes the inconsistent stance that the ALJ should accord great weight to the findings of Drs. Gibbs and Miller regarding Claimant's alleged below-average intelligence level but give no weight to the August 2006 finding to the contrary.

Claimant's argument is simply an appeal for the court to impermissibly substitute its judgment for the ALJ. Moreover, the fact the ALJ regarded Claimant's borderline intellectual functioning as an impairment is evidence that the ALJ clearly accorded some weight to the opinions of Drs. Gibbs and Miller. However, as the ALJ noted, Claimant testified to completing twelfth grade

---

[4] These records were not discussed by the ALJ and the court is unable to verify Claimant's allegations regarding her school performance as the school records are illegible.

13

and earning a high school diploma and to not taking any special education courses. (R. 19, 32).

During the administrative hearing, Claimant's counsel did not elicit further testimony after Claimant

testified to completing twelfth grade with a diploma. *See Hawkins v. Chater*, 113 F.3d 1162, 1167

(10th Cir. 1997) ("[W]hen the claimant is represented by counsel at the administrative hearing, the

ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's

case in a way that the claimant's claims are adequately explored."). Accordingly, in reliance on this

testimony, as well as Claimant's past work experience, the ALJ found Claimant's borderline

intellectual functioning to be a non-severe impairment. (R. 19). For the forgoing reasons, the court

finds that the ALJ properly considered the opinions of the state agency consultants and provided a

rational basis for finding that Claimant's alleged borderline intellectual functioning was a non-severe

impairment.

B.    *The ALJ's decision to not order a third consultative examination*

        In discussing Claimant's major depressive disorder, the ALJ acknowledged at step two of the

sequential evaluation process the request by Claimant's counsel for a post-hearing consultative

examination for IQ testing and psychological evaluation to rule out Listings 12.02 (Organic Mental

Disorders) and 12.05C (Mental Retardation).[5] (R. 19). The ALJ, however, found that Claimant's

---

[5] Listing 12.05 sets forth a two-part inquiry for determining whether a Claimant meets the requirements for mental retardation. *Shoulars v. Astrue*, 671 F. Supp. 2d 801 (E.D.N.C. 2009) (citing *Norris v. Astrue*, No. 7:07-CV-184-FL, 2008 U.S. Dist. LEXIS 92635, at *5, 2008 WL 4911794, at *3 (E.D.N.C. Nov. 14, 2008)); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. First, a claimant must satisfy the diagnostic description of mental retardation, which requires a showing of "(1) significantly subaverage general intellectual functioning (2) with deficits in adaptive functioning (3) initially manifested during the developmental period; i.e.... before age 22." *Shoulars*, 671 F. Supp. 2d at 814 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05). Upon making this showing, the claimant must then meet the required severity level of this disorder, which is accomplished by satisfying any one of four categories labeled (A)-(D) under § 12.05. *Id.* The mental retardation listing under category C ("Listing 12.05C") requires (1) a valid verbal, performance or

14

full scale IQ of 60 through 70; and (2) another impairment, physical or mental, that imposes an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

Listing 12.02 states in relevant part:

12.02 Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for this Listing met when the requirements if a claimant in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically demonstrated persistence of at least one of the following: (1) [d]isorientation to time and place; (2) memory impairment . . . ; (3) [p]erceptual or thinking disturbances (e.g., hallucinations, delusions); (4) [c]hange in personality; (5) [d]isturbance in mood; (6) [e]motional liability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or (7) [l]loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing . . . .
AND

B. Resulting in at least two of the following: (1) [m]arked restriction of activities of daily living; (2) [m]arked difficulties in maintaining social functioning; (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4) [r]epeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) [r]epeated episodes of decompensation . . .; (2) [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

15

"alleged possible borderline intellectual functioning is . . . [not] in need of further development." *Id.*

The regulations state that the decision to order a consultive examination is within the discretion of the ALJ. *See* 20 C.F.R. §§ 404.1519a, 416.919a. The regulations provide further that a consultative examination is required when the evidence as a whole is insufficient to support a decision. 20 C.F.R. §§ 404.1519a(2)(b), 416.919a(2)(b). Examples of such situations include the need for "[h]ighly technical or specialized medical evidence" not available from medical sources or the presence of a conflict, inconsistency or ambiguity in the evidence requiring resolution and a medical source is unavailable to discuss the conflict. *Id.* Here, Claimant contends IQ testing, a form of highly technical or specialized medical evidence, is found nowhere in the record and that such evidence is required due to "enough ambiguity about [her] mental impairment to have put the ALJ on notice that further development of the record was required." Pl.'s Mem. at 19-20. Claimant contends the IQ testing is necessary to "rule out application of Listings 12.05C and/or 12.02." *Id.* at 19.

Claimant's argument that the ALJ erred by refusing to order a consultative mental evaluation lacks merit. First, as explained above, the ALJ properly relied on Claimant's educational background and work experience in concluding that Claimant's possible borderline intellectual functioning is a nonsevere impairment. (R. 19). Second, Claimant, who bears the burden through step four of the sequential evaluation process, has failed to submit evidence supporting her argument that her borderline intellectual functioning should have been classified as a severe impairment and thus possibly meeting or medically equaling Listings 12.05C or 12.02. *See Bowen v. Yuckert*, 482 U.S.

---

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.02.

137, 146 n.5 (1987); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). In fact, Claimant has

provided no discussion as to how the evidence before the ALJ meets the requirements of either

listing. Rather, Claimant's argument is limited to the ALJ's discussion of Claimant's Global

Assessment of Functioning ("GAF")[6] scores which generally fell in the range of 41-50[7] (R. 23) and

the minimal weight accorded thereto. Specifically, Claimant contends that "[w]ithout medical advice

or authority, the ALJ in effect gave little or no weight to a whole series of medical records which

displayed a treatment pattern indicating a severely compromised functional level." Pl.'s Mem. 17.

In discussing Claimant's mental impairment, the ALJ acknowledged that Claimant "was seen

through the Caring Family Network for her depression in late 2006 through 2007 into early 2008.

While the [GAF scores] were generally in the 40's, the numerical rating did not correspond with the

narrative portion." (R. 23). The ALJ then discussed records from November 2006, February, March,

May, June, August and September 2007 and February, May and June 2008. (R. 23). In reviewing

these records, the ALJ noted that Claimant's mental status examinations[8] were generally within

normal limits. (R. 557-59, 561, 563, 600-04). The ALJ noted also evidence of Claimant's non-

compliance with appointments or medications but with increased compliance, Claimant was less

depressed with less self pity and her mood and affect was full range. (R. 23, 562, 556-58). The

---

[6] The GAF scale ranges from zero to one-hundred and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV"), 32 (4th ed. 1994).

[7] A GAF of 41-50 indicates "[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32 (bold typeface omitted).

[8] The mental status examination included consideration of the following: orientation, motor skills, thought process, recent/remote memory, mood/affect, attention/concentration, language/speech and suicidal/homicidal. *See e.g.*, (R. 561).

evidence provides sufficient grounds for the ALJ's conclusion that the GAF scores were not consistent with the treating source's findings on examination. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").

Claimant's argument is again a request for the court to reweigh the evidence. However, it is evident that the ALJ gave proper consideration to the evidence presented and his analysis of Claimant's mental impairment is supported by substantial evidence. Accordingly, Claimant's argument is without merit.

### III. The ALJ did not fail to assess Claimant's ability to perform past relevant work in accordance with S.S.R. 82-62.

Claimant contends that the ALJ erred in determining that she could return to her past relevant work ("PRW"). Pl.'s Mem. at 11-14. In particular, Claimant argues that the ALJ failed to make explicit findings regarding the physical and mental demands required of Claimant's prior work as a washer, "cleaner, housekeeping" and industrial cleaner. Pl.'s Mem. at 11-14. In support of this contention, Claimant points out that S.S.R. 82-62 requires an ALJ to make three specific findings of fact in determining whether an individual has the capacity to perform past relevant work:

(1)  A finding of fact as to the individual's RFC.
(2)  A finding of fact as to the physical and mental demands of the past job/occupation.
(3)  A finding of fact that the individual's RFC would permit a return to his or her past job or occupation

Pl.'s Mem. at 12 (quoting S.S.R. 82-62, 1982 SSR LEXIS 27, at *10, 1982 WL 31386, at *4); *see also* 20 C.F.R. §§ 404.1520(f), 416.920(f) ("If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our [RFC] assessment . . . with

18

the physical and mental demands of your past relevant work.")

Here, it is uncontested that the ALJ made a finding of fact as to Claimant's RFC – a finding not challenged by Claimant. In particular, the ALJ found that Claimant can perform medium work that is simple, routine and repetitive, does not involve fast paced or high-volume work and requires occasional interaction with co-workers and supervisors but no interaction with the public. (R. 20). As to the second and third requirements, the ALJ stated "[t]he claimant is capable of performing past relevant work as a washer, housekeeper and industrial cleaner. This work does not require the performance of work-related activities precluded by the claimant's [RFC]." (R. 24). On this point, the ALJ relied on testimony from the VE that pursuant to the DOT, Claimant's past jobs had a specific vocational preparation ("SVP") time of "2" and were either light or medium in exertion.[9] *Id.* The ALJ concluded that "[i]n comparing the claimant's [RFC] with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed."

Claimant, relying on *Young v. Commissioner of Social Security*, No. 3:09-01676-JMC-JRM, 2010 U.S. Dist. LEXIS 100228, 2010 WL 3814415 (D.S.C. Sept. 2, 2010), contends the above analysis is insufficient as the ALJ improperly "parroted the jobs listed by the [VE] in her testimony without making his own finding of fact as to the physical and mental demands of her past jobs or occupations." Pl.'s Mem. at 13. In *Young*, the court remanded the case based on the ALJ's reliance

---

[9] SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dept. of Labor, Dictionary of Occupational Titles, App. C, 1009 (4th ed. 1991). An SVP of 2 equates to "unskilled work," *see* S.S.R. 00-4p, 2000 SSR LEXIS 8, at *8, 2000 WL 1898704, at *3, which is defined as work "need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a).

on the VE's testimony as to the claimant's past relevant work because "no findings were made [during the administrative hearing] as to the demands of these jobs as [the claimant] actually performed them." *Young*, 2010 U.S. Dist. LEXIS 100228, at *28, 2010 WL 3814415, at *10. This court respectfully disagrees with the *Young* holding for two reasons. First, in determining whether a claimant retains the RFC to perform PRW, the ALJ may consider the "actual functional demands and job duties of a particular past relevant job" or "[t]he *functional demands and job duties of the occupation as generally required by employers* throughout the national economy." S.S.R. 82-61, 1982 SSR LEXIS 31, at *4, 1982 WL 31387, at *2 (emphasis added); *see also Pass*, 65 F.3d at 1207 (explaining "a claimant will be found 'not disabled' if [s]he is capable of performing [her] past relevant work either as [s]he performed it in the past *or* as it is generally required by employers in the national economy") (emphasis in original). Second, in determining PRW, the ALJ is entitled to rely on the testimony of a VE who "may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as *generally performed in the national economy*." 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) (emphasis added); *see also* S.S.R. 82-62, 1982 SSR LEXIS 27, at *7, 1982 WL 31386, at *3 (recognizing that determination of the claimant's ability to perform past relevant work may require "supplementary or corroborative information from other sources"); S.S.R. 82-61, 1982 SSR LEXIS 31, at *5, 1982 WL 31387, at *2 (in determining PRW characteristics, "it may be necessary to utilize the services of a [VE]").

Here, the requirements of Claimant's past relevant work, according to the DOT, include the ability to perform light or medium work, a reasoning level of one or two which is consistent with a limitation to simple, routine, repetitive tasks, *see Burnette v. Astrue*, No. 2:08-CV-9-FL, 2009 U.S.

20

Dist. LEXIS 24656, at *17, 2009 WL 863372, at *5 (E.D.N.C. Mar. 24, 2009), and a skill level consistent with the ability to understand, carry out, and remember simple instructions, *see* S.S.R. 85-15, 1985 SSR LEXIS 20, at *11, 1985 WL 56857, at *4. The VE testified that Claimant, based on the ALJ's RFC finding, could perform the duties of her PRW and testified further that her testimony did not conflict with the DOT. (R. 54-55). The ALJ appropriately adopted the VE's testimony. *See* 20 C.F.R. § 404.1560(b)(2), 416.960(b)(2); *see also Hicks v. Astrue*, No. 0:09-3053-CMC-PJG, 2010 U.S. Dist. LEXIS 141125, at *19, 2010 WL 5776697, at *6 (D.S.C. Dec. 13, 2010) (holding the ALJ complied with the requirements of S.S.R. 82-62 where the ALJ relied on the testimony of a VE); *Thompson v. Astrue*, No. 8:09-01968-JFA-BHH, 2010 U.S. Dist. LEXIS 102596, at *9, 2010 WL 3878729, at *3 (D.S.C. June 16, 2010) (holding the ALJ sufficiently addressed the second requirement of S.S.R. 82-62 by "referr[ing] to the testimony of the [VE] that the plaintiff's PRW was sedentary work with an 'SVP of 3'"); *Atkins v. Astrue*, No. 3:09-0078, 2010 U.S. Dist. LEXIS 31652, at *5-6, 2010 WL 1404319,at *2 (S.D. W. Va. Mar. 30, 2010) (holding the ALJ made a specific finding as to the second requirement by "adopt[ing] the [VE's] testimony that an individual with plaintiff's residual functional capacity would be able to perform his past work")

As the duties of Claimant's PRW are consistent with her RFC for medium work, Claimant has failed to demonstrate any deficiency in the ALJ's determination. Moreover, even if the ALJ insufficiently satisfied the requirements of S.S.R. 82-62, such error is harmless as Claimant has failed to outline any analysis under this ruling which would be favorable to her. *See Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983) (explaining that the claimant must make a *prima facie* showing of disability by showing that she is unable to return to her past relevant work); *Austin v. Astrue*, No. 7:06-CV-00622, 2007 U.S. Dist. LEXIS 77892, at *18, 2007 WL 3070601, *6 (W. D.

Va. Oct. 18, 2007) (holding that "[e]rrors are harmless in Social Security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error") (citing *Camp v. Massanari*, 22 Fed. Appx. 311 (4th Cir. 2001)). For the foregoing reasons, Claimant's argument is without merit.

## CONCLUSION

For the reasons stated above, this court RECOMMENDS Claimant's Motion for Judgment on the Pleadings be DENIED, Defendant's Motion for Judgment on the Pleadings be GRANTED and the final decision of the Commissioner be UPHELD.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days upon receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 15th day of April, 2011.

Robert B. Jones, Jr.
United States Magistrate Judge